802 A.2d 512

FAIR SHARE HOUSING CENTER, INC., NEW JERSEY COUNCIL OF CHURCHES, CAMDEN COUNTY BRANCH OF THE N.A.A.C.P. AND SOUTHERN BURLINGTON COUNTY BRANCH OF THE N.A.A.C.P., PLAINTIFFS–APPELLANTS, v. TOWNSHIP OF CHERRY HILL, NEW JERSEY AND GEORGE H. CROFT, II, AND JOHN W. CROFT, III, TRUSTEES UNDER THE WILL OF JOHN W. CROFT, JR., DEFENDANTS–RESPONDENTS, AND REALEN–TURNBERRY/CHERRY HILL, L.L.C., INTERVE-NOR–RESPONDENT.

Argued April 30, 2002—Decided August 5, 2002.

*Kevin D. Walsh* and *Peter J. O'Connor* argued the cause for appellants.

*Ronald C. Morgan* argued the cause for intervenor-respondent (*Parker, McCay & Criscuolo,* attorneys; Mr. Morgan and *Kevin D. Sheehan,* on the briefs).

*Susan Jacobucci,* Township Solicitor, argued the cause for respondent Township of Cherry Hill.

*Allen S. Zeller* argued the cause for respondent Township of Cherry Hill Planning Board (*Zeller and Bryant,* attorneys; *Mr. Zeller and Wayne R. Bryant,* on the briefs.)

*Edwin W. Schmierer* argued the cause for *amicus curiae* New Jersey State League of Municipalities (*Mason, Griffin & Pierson,* attorneys; *Trishka Waterbury* and *Stuart Koenig,* on the brief).

*William P. Malloy,* Deputy Attorney General, submitted a brief on behalf of *amicus curiae* New Jersey Council on Affordable Housing (*David N. Samson,* Attorney General of New Jersey, attorney; *Douglas K. Wolfson,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

STEIN, J.

The protracted history of the exclusionary zoning litigation filed by Fair Share Housing Center, Inc., and other parties (FSHC or plaintiffs) against the Township of Cherry Hill (Township) began in May 1985 after our decisions in *Southern Burlington County*

*NAACP v. Mount Laurel Township,* 67 *N.J.* 151, 336 *A.*2d 713, *cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975)(*Mount Laurel I*) and *Southern Burlington County NAACP v. Mount Laurel Township,* 92 *N.J.* 158, 456 *A.*2d 390 (1983)(*Mount Laurel II*). The parties entered into a settlement agreement in 1993 (Agreement) that achieved resolution of significant issues raised in that litigation. The case is before us on direct appeal in part to address the scope of that Agreement. More broadly, the appeal presents the question whether a municipality that has neither received nor sought from the Council on Affordable Housing (COAH) substantive certification for round two or round three can exclude a large parcel of vacant land as a site for low and moderate income housing simply by imposing a development fee on the owner of the property.

I

In the interest of clarity and completeness, we set forth at length the underlying factual and procedural history to provide a context for our disposition.

Shortly after the filing of this suit in May 1985, the Legislature adopted the Fair Housing Act (FHA), L.1985, c. 222, *N.J.S.A.* 52:27D–301 to –329, which later was upheld in *Hills Development Company v. Bernards Township,* 103 *N.J.* 1, 25, 510 *A.*2d 621 (1986). By enacting the FHA, the Legislature declared "the State's preference for the resolution of existing and future disputes involving exclusionary zoning" through the "mediation and review process . . . and not litigation." *N.J.S.A.* 52:27D–303. The Legislature stated that the FHA was intended to "provide various alternatives to the use of the builder's remedy as a method of achieving fair share housing." *Ibid.* The FHA also authorized COAH to promulgate guidelines for municipal determination of Mount Laurel obligations. *N.J.S.A.* 52:27D–305.

In January 1986, the trial court issued an order transferring count one of plaintiffs' complaint to COAH for administrative

disposition pursuant to *N.J.S.A.* 52:27D–316(b).[1]   Count one sought to compel the Township's compliance with the *Mount Laurel* doctrine.   The court retained jurisdiction over count two in which plaintiffs asserted that the Township deliberately had excluded a specific parcel of land from consideration as a site to be used to fulfill the Township's *Mount Laurel* obligation.   In the Order, the trial court also restrained the Township from selling or developing any "township-owned land of three (3) acres or more in size."

After transferring count one to COAH, the Township timely submitted a housing element and fair share plan to avoid reversion of the case to the Superior Court.   Under COAH's methodology, the Township was assigned an initial precredited need [2] of 2295 units for the period from 1987 to 1993 (round one).   That total number included 2104 "reallocated present need" [3] units and 181 "indigenous need" [4] units.   Because of COAH's 1000 unit cap rule,

---

[1] *N.J.S.A.* 52:27D–316(b) provides:

> b.   Any person who institutes litigation less than 60 days before the effective date of this act or after the effective date of this act challenging a municipality's zoning ordinance with respect to the opportunity to provide for low or moderate income housing, shall file a notice to request review and mediation with the council pursuant to sections 14 and 15 of this act.   In the event that the municipality adopts a resolution of participation within the period established in subsection a. of section 9 of this act, the person shall exhaust the review and mediation process of the council before being entitled to a trial in his complaint.

[2] When COAH promulgated the Township's initial fair share unit numbers, "precredited need" meant "the municipality's estimated obligation under the *Mount Laurel* mandate for the period 1987 to 1993." *N.J.A.C.* 5:92 Appendix A. Under the current COAH definitions, " 'pre-credited' need means the municipal low and moderate income housing obligation resulting from subtracting filtering, residential conversion and spontaneous rehabilitation from the sum of indigenous need, reallocated present need, prior cycle prospective, prospective need and demolitions." *N.J.A.C.* 5:93–1.3.

[3] Reallocated present need is "that portion of a housing region's present need that is redistributed throughout the housing region." *Ibid.*

[4] Indigenous need is the number of "deficient housing units occupied by low and moderate income households within a municipality." *Ibid.*

the Township's obligation was reduced to 1000 units consisting of "819 inclusionary new construction units and 181 indigenous rehabilitation units."

Thereafter, the Township sought a reduction of its first round obligation from 2295 units to 1292 units based on a lack of "vacant, developable and suitable land." COAH issued an Order and Opinion in April 1987, determining that vacant land was an issue in the Township. COAH stated that "[u]ntil Cherry Hill has availed itself of the entire process and its housing element has gone through a detailed Council review and mediation and received substantive certification, the Council must utilize and deal with the only number presently applicable to Cherry Hill—2295." It thus declined to "speculate on Cherry Hill's ability to adjust or amend its pre-credited need." It then supplemented the Law Division's restraining Order of January 23, 1986, requiring the Township "to refrain from any action [that] would dissipate the vacant land presently existing in the Township."

COAH later amended its April 1987 Order and Opinion with a June 1, 1987 Order, clarifying that the Township was "restrained from granting any type of developmental approval for the development of any parcel of vacant land in excess of two acres in size," but allowing the Township to process applications as long as it did not grant any application or create any vested rights. The amending Order specifically continued in full effect the trial court's Order of January 23, 1986. The amending Order was intended to remain in effect until modified by COAH or until the Township's petition for substantive certification either was granted or denied.

In March 1987, COAH ordered the Township "to remedy certain [ ] deficiencies [in its previously and timely filed fair share plan] and to resubmit the plan within 60 days." *Fair Share Housing v. Township of Cherry Hill,* 242 *N.J.Super.* 76, 78, 576 *A.*2d 24 (App.Div.1990). Thereafter, the Township resubmitted its plans, which "[u]nder *N.J.A.C.* 5:91–4.2 ... constituted a petition for substantive certification." *Id.* at 79, 576 *A.*2d 24. Notice of

the Township's petition for certification was published shortly thereafter. After several parties objected to the plan, the Township entered mediation, which began in August 1987 and continued until February 1988. The mediation resulted in the creation of a plan that eliminated certain techniques that the Township had proposed to use in satisfying its fair share obligation. Plaintiffs and the COAH task force previously had concluded that those techniques were inappropriate. *Id.* at 79, 576 *A.*2d 24.

Thereafter, the Township's petition for substantive certification, based on the mediated plan, was presented to COAH. Days before COAH was to act on the petition for certification, the Township sought to amend the mediated plan to reinstate the objectionable techniques that previously had been eliminated. COAH denied the Township's motion. On the same date, the petition for substantive certification was approved based on the mediated plan, subject to several conditions. The Township failed to comply with the conditions within the timeline. *Ibid.* On September 26, 1988, COAH denied the Township's application for substantive certification and transferred the matter (count one) back to the Law Division. *Id.* at 79–80, 576 *A.*2d 24. That ended COAH's direct participation in this motion.

The Township appealed COAH's denial of the Township's motion to amend the mediated plan to the Appellate Division. The Appellate Division held that COAH's order denying the Township's motion to amend was an interlocutory order that could not be appealed. *Id.* at 77, 576 *A.*2d 24. Thus, it ordered that plaintiffs' exclusionary zoning suit should proceed in the Law Division. *Id.* at 83, 576 *A.*2d 24.

After the return of jurisdiction to the Law Division, the trial court, in a December 1988 Order, continued in full effect its 1986 Order "restraining the sale and/or development of all parcels of *Township-owned* land of three (3) acres or more in size." (Emphasis added). The December Order further "restrained [the Township] from granting sub-division, site plan and variance approvals for the development of any parcel of *privately-owned*

vacant land of ten (10) acres or more in size for a period of 90 days from December 5, 1988." (Emphasis added). The Order allowed the Township to receive and process applications. However, consistent with COAH's 1987 Order, it provided that the processing of any applications would not "create any vested rights or uses or claims of reliance in or by the applicants." The January 1986 and the December 1988 Orders were continued by subsequent orders issued in March 1989, July 1989, March 1990, October 1990, and June 1991. The June 1991 Order provided that the terms of the previous orders, all of which specifically were incorporated in the June 1991 Order, would remain in effect for six months "unless otherwise ordered by the Court."

On March 12, 1993, the Township and plaintiffs, with the assistance of Special Master Philip Caton, entered into a settlement agreement addressing the Township's disputed round one fair share obligation. The parties drafted the Agreement in reliance on certain documentation, including plaintiffs' motion to set the Township's fair share number at 2295, the Township's brief in opposition, reports from Special Master Caton, environmental reports, and plans and maps of certain parcels of land in the Township. In the Agreement, the parties agreed to reduce the Township's round one fair share obligation of 2295 units to 787 units because of a "lack of adequate vacant, [and] developable land." The Agreement stated:

> The maximum capability and responsibility of Cherry Hill in fulfilling its *Mount Laurel* affordable housing obligation in light of the scarcity of land in the Township is a Fair Share obligation of 735 units plus 52 indigenous need units total[ing] 787 units.
>
> *As a result of the lack of adequate vacant, developable land the Township's fair share is reduced from 2295 to 787.* By the Township implementing the terms of the compliance pursuant to this Order, it has addressed its realistic, development potential. This Fair Share allocation shall represent the Township of Cherry Hill's *Mount Laurel* responsibility for 1987–1999.
>
> [ (Emphasis added).]

The Agreement also identified "[t]he Township's indigenous need

[as] 191 units with 139 rehab [5] credits, resulting in an indigenous obligation of 52 units."

The Agreement outlined a variety of mechanisms by which the Township's obligation could be fulfilled. It identified "[e]leven (11) parcels in the Township with 'potential to be developed for inclusionary development' with an allocation of 685 affordable units" as well as "[v]arious miscellaneous parcels with a combined total allocation of 50 affordable units." In addition, it permitted the Township to discharge part of its obligation through a Regional Contribution Agreement (RCA) with the City of Camden and by a mandatory development fee ordinance.

Moreover, the Agreement provided that "[i]n the event during the next six (6) years" the Merchantville Country Club, Woodcrest Country Club, Springdale Farm, Barclay Farm, Springhouse Farm Trust or the Apostolic Church "parcels become available for development, the Township's fair share allocation as to these properties shall be re-evaluated." Additionally, the parties stipulated that the Township's *fair share obligation through 1999 would not exceed 1000 units*[6]. Finally, the Agreement provided

---

[5] A rehabilitated unit is a "previously deficient housing unit [that] has undergone significant renovation to meet municipal or other applicable housing code standards...." *N.J.A.C.* 5:93–1.3.

[6] The reference to a 1000 unit cap presumably is related to a COAH rule, *N.J.A.C.* 5:92–7.1(b), effective August 3, 1987, that limited a municipality's fair share obligation to 1000 units during a six-year period of substantive certification. See 19 *N.J.R.* 806(a), 19 *N.J.R.* 1431(a). The rule later was held to be invalid in *Calton Homes v. Council on Affordable Housing*, 244 *N.J.Super.* 438, 462, 582 A.2d 1024 (App.Div.1990). The Legislature thereafter amended the FHA to provide for a new 1000 unit cap rule. *N.J.S.A.* 52:27D–307(e). COAH also amended its rule to provide that a municipality may not be required to "address a fair share beyond 1,000 units within six years from the grant of substantive certification unless it is demonstrated" that the municipality can "create a realistic opportunity for more than 1,000 low and moderate income units within the six year period." *N.J.A.C.* 5:93–14.1. [Effective January 10, 2002, P.L.2001, c. 435 amended section 7 of P.L.1985, c. 222, the Fair Housing Act, so that fair share need is now calculated in ten-year increments. *N.J.S.A.* 52:27D–307.]

that a judgment of repose would be entered and the December 5, 1988 Order imposing a scarce resource moratorium would be vacated following a formal compliance hearing.

On March 15, 1993, COAH proposed its round two methodology. 25 *N.J.R.* 1118(a). On March 30, 1993, approximately two weeks after the Agreement was signed and COAH's round two methodology was proposed, the court entered an Order determining that the Agreement was fair and reasonable. The court approved the Agreement in its entirety, except for two changes. The trial court further reduced the Township's obligation for 1987–1999 from 787 units to 758 units [7] and reduced the designated parcels of land from eleven to ten. It also provided that the Township of Cherry Hill Planning Board (Planning Board) should adopt an amended housing element and the Township should adopt an amended zoning ordinance by June 15, 1993. It further provided that Special Master Caton would report on the Township's compliance plan by July 1, 1993. Thereafter, a formal compliance hearing would be held "before the [c]ourt on July 26, 1993," and the court, upon a finding of compliance, would "enter a Judgment of Repose and vacate the scarce resources moratorium imposed by court Order of December 5, 1988...." In all other respects, the 1993 Order adopted the 1993 Agreement verbatim, including the significant determination that the Township's "realistic, development potential" was 758 units, as reduced from the 2295 units calculated by COAH as constituting the Township's round one obligation. The judgment of compliance hearing never occurred, and the Township failed to petition the court for entry of a judgment of repose and to have the court vacate the scarce resource moratorium by the July 26, 1993, date imposed by the 1993 Order.[8]

---

[7] That number since has been reduced by approximately five different orders issued between 1993 and 2001. The Township's affordable unit obligation under the 1993 Agreement and Order currently is 695 affordable units and 52 indigenous needs units.

[8] After our grant of direct certification in this case, the trial court issued several opinions, orders and decisions. For example, the trial court issued an

In December 1993, COAH sought comment pertaining to its proposed second-round methodology and regulations. 25 *N.J.R.* 5763(a). The final regulations were adopted in May 1994, and became effective on June 6, 1994. 26 *N.J.R.* 2300. Under the second-round methodology, the Township was assigned a precredited need of 1851 units of affordable housing.

Thereafter, the Township adopted a development fee ordinance (Ordinance 94–21), which later was approved by the trial court. Ordinance 94–21 provides that "[f]ees collected pursuant to this ordinance shall be used for the sole purpose of addressing the Township's Municipal Fair Share of low and moderate income housing." It also establishes a housing trust for receiving the development fees and directs that "[n]o money shall be expended from the housing trust unless the expenditure conforms to a spending plan approved by the Mount Laurel Judge." More importantly, it provides that the *"ordinance shall be interpreted within the framework of COAH's rules on development fees."* (Emphasis added). It also states that if the "Mount Laurel judge determines that the Township of Cherry Hill is not in conformance with COAH's rules on development fees, the [Mount] Laurel judge is authorized to direct the manner in which all development fees collected pursuant to this ordinance shall be expended." Most significantly, the Ordinance provides that

[*t*]*he authority to collect development fees shall expire* if the Mount Laurel judge denies with prejudice the Township's petition for a judgment of repose or, if a judgment of repose is granted, *with the expiration of the judgment of repose unless*

opinion and an order on March 20, 2002 granting the Township's motion for a retroactive judgment of repose. The judgment of repose was entered from a date the trial court determined that the Township had completed all requirements that the trial court had imposed in the 1993 Order, and expired in March 2000. The trial court also issued an opinion determining that the Township had complied with the terms of the 1993 Agreement and Order. Although questions concerning the validity of any opinions, orders and decisions issued after our grant of direct certification are not before us, we acknowledge serious concerns about the trial court's jurisdiction to entertain any such proceedings. See *Rule* 2:9–1(a).

*the municipality filed a housing element with COAH, petitions for substantive certification and receives the Council's approval of its development fee ordinance.*[9]
[ (Emphasis added).]

As noted, the Township's retroactively granted judgment of repose for its first round expired in March 2000 and the Township only recently has sought from COAH what it describes as an "extension of substantive certification." However, it has not filed with COAH a petition for substantive certification for its second round, apparently relying on the retroactively granted judgment of repose as applying both to its first and second rounds. Accordingly, it appears that the Township has no current authority to collect development fees.

A December 1999 letter from COAH to the Township addressed two issues concerning COAH's interpretation of the 1000 unit cap rule pursuant to *N.J.S.A.* 52:27D–307(e) and *N.J.A.C.* 5:93–14.1. The first issue concerned COAH's second round cumulative methodology for municipalities having a first-round fair share obligation over 1000 units. Pursuant to its cumulative methodology, see *N.J.A.C.* 5:93–1 to 5:93–15.1, COAH "recalculated and incorporated the first-round 1987–1993 need into the second-round 1987–1999 need," which meant that the 1000 unit cap rule had to be interpreted relative both to a six-year cycle and a twelve-year cycle, accounting for two six-year periods of a municipality's affordable housing obligation. That is because *N.J.S.A.* 52:27D–307(e) and *N.J.A.C.* 5:93–14.1 state that no municipality is re-

---

[9] Although we need not decide the validity of Ordinance 94–21, as that issue is not directly before us and has not been briefed by the parties, we note that the Township's ability to collect development fees under Ordinance 94–21 expires unless there is a current judgment of repose or the Township "filed a housing element with COAH, petitions for substantive certification and receives the Council's approval of its development fee ordinance." The ordinance's requirement is consistent with *N.J.A.C.* 5:93–8.1(b), providing that municipalities "may only impose, collect and spend development fees" after substantive certification "or through a comprehensive review designed to achieve a judgment of repose" and *N.J.A.C.* 5:93–8.21(b), providing that the municipality's ability to impose, collect or expend development fees expires with the expiration of substantive certification or judgment of repose.

quired to "address a fair share beyond 1,000 units within six years." In the letter to the Township, COAH indicated that the Township's *revised* pre-credited need for round two was 1669 units. All eligible credits and reductions would then be subtracted from 1669 and capped at 1000 if the remaining number of units exceeded 1000.

The second issue concerned whether the 1000 unit cap rule would apply to a municipality's "pre-credited need," see *N.J.A.C.* 5:93–2.13, or to its post-credited or "calculated need," see *N.J.A.C.* 5:93–2.17. COAH determined that the cap should apply after subtraction of all the credits that COAH's rules allowed.[10]

In 2000, the Garden State Park (GSP) racetrack was placed on the market for sale. The GSP property is a 225–acre property that was zoned B–4 in 1982 and consistently has been zoned as such. A B–4 zoning allows for a mix of non-residential and residential uses at high intensities and densities.

Realen–Turnberry/Cherry Hill, L.L.C. (Realen) sought to purchase the GSP parcel to build 1700 units of luxury housing, five hundred fifty thousand square feet of commercial space, one million square feet of office space, and a 150–room hotel. It retained COAH's former Executive Director, Art Bernard, as a consultant to determine its obligation to construct on-site affordable housing. In concluding that the GSP had no on-site obligation, Mr. Bernard made four notable determinations: (1) the GSP parcel was not designated as a future inclusionary parcel in the 1993 Agreement; (2) the 1993 Agreement incorporated a fee ordinance mechanism for capturing contributions from non-designated parcels to fulfill the Township's affordable housing obligation, and the GSP was subject only to that specific provision; (3) this Court in *Holmdel Builders Association v. Township of Holm-*

---

[10] COAH's determination of that issue was challenged in *In re the Application of the Township of Jackson.* The Appellate Division recently affirmed COAH's determination that the 1000 unit cap rule would be applied to calculated need rather than precredited need. *In the Matter of the Application of the Township of Jackson,* 350 *N.J.Super.* 369, 378–79, 795 A.2d 318 (App.Div.2002).

*del,* 121 *N.J.* 550, 573, 583 *A.*2d 277 (1990), stated that development fees are the "functional equivalent" of inclusionary zoning; and (4) the Township had been complying with the 1993 Agreement.

Realen purchased the 222–acre parcel in 2001. Subsequent to the purchase of the land, Realen learned that when Realen's redevelopment plans were brought before the Township plaintiffs would assert that Realen should be responsible for "on-site" production of affordable housing even if it paid a development fee. Simultaneously, Realen was designing a General Development Plan (GDP) for submission to the Township's Planning Board with the understanding that it would be responsible for more than four million dollars in development fees.

Concluding that it would be in its best interest to obtain a judicial determination of its rights, Realen filed a motion in June 2001 to intervene in the original litigation that was ongoing with respect to count two, seeking a declaratory judgment that it did not have any obligation to construct affordable housing on its site because it was subject to payment of a development fee pursuant to *N.J.A.C.* 5:93–8.10(a), addressing residential development fees, and *N.J.A.C.* 5:93–8.11(a), addressing non-residential development fees. Plaintiffs opposed the motion and filed several cross-motions, including a motion for a site-specific restraining order against Realen, a motion to require the Township to submit a compliance plan including the GSP property, and a motion to strike the Bernard certification.

In a July 2001 appearance before the trial court, FSHC objected to the report submitted by Mr. Bernard, contending that it had been denied the opportunity to explore through discovery the conclusions contained in the report. The court limited the issue before it to the question whether development fees are the functional equivalent of mandatory set-asides. The trial court issued a written opinion in October 2001, holding that development fees are the functional equivalent of actual construction of affordable housing, and determining that Realen had no obligation to build affordable housing on its site.

FSHC moved for reconsideration, supported by the certification of David Kinsey, a former court-appointed Special Master in numerous Mount Laurel exclusionary zoning lawsuits. Kinsey's certification asserted that the trial court's determination of the development fee issue was premature because the Township's compliance with its Mount Laurel obligation had not been judicially determined. The trial court subsequently denied plaintiffs' motion for reconsideration. Following the denial of the motion for reconsideration, plaintiffs filed simultaneously a motion for leave to appeal with the Appellate Division and a motion for direct certification with this Court. This Court granted plaintiffs' motion for direct certification. 171 *N.J.* 38, 791 *A.*2d 218 (2002).

After our grant of direct certification, the Township, the Planning Board and plaintiffs executed and filed a Stipulation of Partial Settlement on March 8, 2002, stating that the Township substantially had complied with the terms of the 1993 Agreement and Order. On the same date, the trial court heard oral argument on the Township's motion to impose a judgment of repose. Thereafter, as noted, the trial court granted the Township's motion for a judgment of repose "with an effective date of March 24, 1994, on which date the court believes [a judgment of repose] would have [been] entered" had the trial court "been given the opportunity to do so." The trial court explained that the procedural requirements for a judgment of repose previously had been met, subject to the formality of actually entering the judgment. It explained that entering a retroactive judgment of repose that expired six years after it would have been entered, on March 24, 2000, "is neither temporally illogical nor meaningless in terms of public policy" because it provides some sense of finality to the litigation.

II

A

In *Mount Laurel I, supra,* this Court held that developing municipalities constitutionally are required to provide a realistic

opportunity for the development of affordable housing for low and moderate-income families. 67 *N.J.* at 179, 336 *A.*2d 713. In *Mount Laurel II, supra,* 92 *N.J.* at 266–67, 456 *A.*2d 390, the Court reaffirmed *Mount Laurel I* and identified several possible methods, such as density bonuses and mandatory set-asides, by which municipalities can comply with their constitutional obligation. We also stated that "municipalities and trial courts are encouraged to create other devices and methods for meeting fair share obligations." *Id.* at 265–66, 456 *A.*2d 390.

Because of our encouragement in *Mount Laurel II,* some municipalities adopted development fee ordinances as a possible device or method "for meeting fair share obligations." *Holmdel, supra,* 121 *N.J.* at 556, 583 *A.*2d 277. Such fees typically were to be placed in an affordable-housing trust to satisfy the municipality's Mount Laurel obligation. In *Bi–County Development of Clinton, Inc. v. Borough of High Bridge,* —— *N.J.* ——, ——, —— *A.*2d ——, 2002 *WL* 1787924 (2002), also decided today, we addressed the context in which the Court approved the concept of development fees, subject to COAH authorization, to assist municipalities in meeting their Mount Laurel obligations.

In *Holmdel,* several municipal ordinances imposing fees on developers as a condition for development approval were challenged. We approved the use of development fees "as part of a municipality's housing element," *id.* at 586, 583 *A.*2d 277, and as a " 'device . . . for meeting [a municipality's] fair share obligations,' " *id.* at 563, 583 *A.*2d 277 (quoting *Mount Laurel II, supra,* 92 *N.J.* at 265–66, 456 *A.*2d 390). *See also Southport Dev. Group, Inc., v. Township of Wall,* 295 *N.J.Super.* 421, 435, 685 *A.*2d 84 (1996) ("Thus, the Court in *Holmdel* focused on the role of a development fees ordinance in the compliance process and concluded that 'each ordinance has a direct and material bearing on the municipality's effort to meet its fair-share affordable-housing obligation,' and the ordinance is 'subject to review and certification . . . as a constituent part of the housing-element plan.' ") (citations omitted). Reiterating that the "core of [our *Mount Laurel* ] decisions is that

*every* municipality, not just developing municipalities, must provide a *realistic*, not just a theoretical opportunity for the construction of lower-income housing," we stated that the "solution to the shortage of affordable housing could not 'depend on the inclination of developers to help the poor, [but rather depends] on affirmative inducements to make the opportunity real.'" *Holmdel, supra,* 121 *N.J.* at 562–63, 583 *A.*2d 277 (quoting *Mount Laurel II, supra,* 92 *N.J* at 261, 456 *A.*2d 390)(emphasis in original). The Court held that, with the approval of COAH, municipalities could impose development fees on commercial and non-inclusionary residential property as an appropriate inclusionary zoning measure to provide affordable housing. *Id.* at 586, 456 *A.*2d 390.

In *Holmdel,* we recognized that the "principal mode of compliance suggested in *Mount Laurel II* was mandatory set-asides," but noted that "we never envisaged mandatory set-asides as the exclusive solution for the dearth of lower-income housing." *Id.* at 563, 583 *A.*2d 277. We also stated that the "solutions proposed in *Mount Laurel II* to meet the critical shortage of affordable housing were strongly influenced by the Court's perception of the causes of that shortage," namely, the "flight of industry and commerce from urban to suburban areas." *Ibid.* We observed that the "phenomenon of unfettered non-residential development ha[d] exacerbated the need for lower-income housing," thereby generating "widespread efforts to link such needed residential development to non-residential development" and "to shift the externalities of development to non-inclusionary developers." *Ibid.*

The Court further noted:

> The broad concept of linkage describes any of a wide range of municipal regulations that condition the grant of development approval on the payment of funds to help finance services and facilities needed as a result of development. In the context of developing affordable housing, linkage refers to any scheme that requires developers to mitigate the adverse effects of non-residential development upon the shortage of housing either indirectly, by contributing to an affordable-housing trust fund, or directly, by actually constructing affordable housing.

. . . .

The fairness and legality of linkage have inspired much debate among legal scholars, the business community, and the judiciary. Proponents, ... forcefully argue that by attracting new residents to an area, commercial developments increase the need for housing in general and thus for affordable housing. To the extent that the additional need for housing is not met with increased supply, housing prices will be pushed upward, exacerbating both the need for, and unattainability of, lower-income housing. *Therefore, it is appropriate for municipalities to charge commercial developers with a portion of the responsibility for creating more affordable-housing units.*

[*Id.* at 564–65, 583 A.2d 277 (emphasis added).]

The Court also observed that

linkage advocates stress the need to consider the effect of all development on the finite supply of land. Land must be viewed as an essential but exhaustible resource; any land that is developed for any purpose reduces the supply of land capable of being used to build affordable housing. *The scarcity of land as a resource bears on the opportunity and means to provide affordable housing. This Court has implicitly recognized [in Mount Laurel II, supra, 92 N.J. at 210 n. 5, 456 A.2d 390] that unrestrained nonresidential development can itself deepen the shortage of affordable housing.*

[*Id.* at 565–66, 583 A.2d 277 (citations omitted)(emphasis added).]

Against that background, the Court considered "whether development-fee ordinances were statutorily authorized." *Id.* at 566, 583 A.2d 277. It stated that

[a]ffordable housing is a goal that is no longer merely implicit in the notion of the general welfare. It has been expressly recognized as a governmental end and codified under the FHA, which is to be construed in *pari materia* with the [Municipal Land Use Law (MLUL) ]. *See Hills Dev. Co., supra,* 103 N.J. at 33–34, 510 A.2d 621.... The FHA specifies that a municipality's zoning power be used to create a housing element "designed to achieve the goal of access to affordable housing to meet present and prospective housing needs, with particular attention to low and moderate income housing." *N.J.S.A.* 52:27D–310. Also, the municipality must "establish that its land use and other relevant ordinances have been revised to incorporate" provisions for a realistic opportunity for the development of lower-income housing. *N.J.S.A.* 52:27D–311a. We thus have no doubt that provision of lower-income housing is one of the purposes of zoning incorporated by reference into the zoning enabling act.

[*Id.* at 567, 583 A.2d 277.]

The Court then noted that "[a]s compared with relatively random and rigid set-aside zoning, development fees provide a more flexible and comprehensive approach that will encourage the appropriate use and development of land within a municipality to satisfy the municipality's fair-share obligation." *Id.* at 569–70, 583

*A.*2d 277. The Court also determined that the relationship between "unrestrained nonresidential development and the need for affordable residential development ... is to be founded on the actual, albeit indirect and general, impact that such nonresidential development has on both the need for lower-income residential development and on the opportunity and capacity of municipalities to meet the need." *Id.* at 572, 583 *A.*2d 277. We also stated that "[i]nclusionary zoning through the imposition of development fees is permissible because such fees are conducive to the creation of a realistic opportunity for the development of affordable housing ... and it is fair and reasonable to impose such fee requirements on private developers when they possess, enjoy, and consume land, which constitutes the primary resource for housing." *Id.* at 572–73, 583 *A.*2d 277 (citing *Mount Laurel II, supra,* 92 *N.J.* at 274, 456 *A.*2d 390). In that context, we observed that "development fees are the functional equivalent of mandatory set-asides." *Ibid.*

The Court then stated that "[t]he nature and extent of authority to provide affordable housing under zoning laws and general police powers is inextricably related to the FHA." *Id.* at 573, 583 *A.*2d 277.

> The FHA does not expressly authorize a municipality to impose development fees as a means to provide lower-income housing. Nevertheless, the FHA confers on a municipality a broad range of general powers, including the authority "to provide for its fair share of low and moderate income housing by means of any technique or combination of techniques which provide a realistic opportunity for the provision of [its] fair share."
>
> [*Ibid.* (citing *N.J.S.A.* 52:27D–311a).]

Acknowledging that COAH currently did not have regulations specifying standards for development fees, we stated that COAH "in the exercise of sound administrative discretion, should consider the desirability and feasibility of such development fees in the broader context of the State's affordable housing policy." *Id.* at 580, 583 *A.*2d 277. Based on that extensive analysis and explanation, the Court upheld the use of development fee ordinances:

> [U]nder the FHA, as well as the zoning power of the MLUL and the police power, municipalities with the approval of COAH *can* impose reasonable fees on the development of commercial and non-inclusionary residential property as inclusion-

ary zoning measures to provide lower-income housing. Such development fees may be enacted by ordinance, and subject to the approval and certification of COAH, *may be included as part of a municipality's housing element and fair-share obligation* under the FHA.

[*Id.* at 586, 583 *A*.2d 277 (emphasis added).]

Following our decision in *Holmdel*, COAH adopted substantive rules governing the imposition, collection, and expenditure of development fees. See *N.J.A.C.* 5:92–18.1 to–18.20. The substantive rules for round one governing development fees provides generally that "a municipality may only collect and spend development fees through participation in the Council's substantive certification process or through a comprehensive review designed to achieve a judgment of repose." *N.J.A.C.* 5:92–18.1(b).

COAH subsequently issued its round two substantive rules at *N.J.A.C.* 5:93–8.1 to–8.22, imposing similar development fee requirements. Those rules also provide that "the Council will review development fee ordinances and plans to spend money upon the request of the court with jurisdiction in an exclusionary zoning lawsuit." *N.J.A.C.* 5:93–8.1(c). COAH will not review or approve development fee ordinances "unless the municipality has petitioned for substantive certification." *N.J.A.C.* 5:93–8.2(a). *N.J.A.C.* 5:93–8.21(b) additionally provides that

*the ability for all [ ] municipalities to impose, collect and expend development fees shall expire with their substantive certification or judgment of repose, unless the municipality has filed an adopted housing element with the Council; petitioned for substantive certification; and received the Council's approval of its development fee ordinance. Municipalities that fail to renew their ability to impose and collect development fees prior to the expiration of their substantive certification or judgment of repose may resume the imposition and collection of development fees by complying with the requirements of this section.*

[ (Emphasis added).]

## B

We noted in *Hills* that COAH would be expected to "periodically adjust its regional need figures."

In other words, the Council is not required to make a static determination by August 1, 1986, but rather the first determination of the major facts and standards that will enable municipalities to determine their fair share at that time, the

Council's determination to be revised "from time to time" in accordance with changing needs and changing circumstances. *The Act contemplates that the information and criteria adopted by the Council at any given time will result in municipal fair share ordinances, revision of which should be considered after six years. That is the same period (six years) used in the Municipal Land Use Law requiring periodic revisions of municipal master plans, N.J.S.A. 40:55D–89, and the period used by this Court in Mount Laurel II, during which a zoning ordinance complying with the Mount Laurel obligation would be protected from attack.*

[103 *N.J.* at 33, 510 *A.*2d 621 (emphasis added) (citations omitted).]

We requested a brief from COAH concerning the issue addressed by the Law Division. COAH indicates in its brief that its most recent municipal fair share calculation methodology (1993–1999) provides for adjustment of a municipality's round two fair share obligation in the event of a lack of adequate and developable vacant land. *See N.J.A.C.* 5:93–4.2(b). Under *N.J.A.C.* 5:93–1.3, vacant land is defined as "undeveloped and unused land area." COAH indicates that pursuant to *N.J.A.C.* 5:93–4.2(b), "a municipality ... [seeking] a vacant land adjustment [ ] must submit an existing land use map and an inventory of all vacant parcels in the municipality." After the municipality submits the land use map and inventory, COAH then determines which sites are most suitable for developing low and moderate-income housing. COAH further "may determine that other sites in the municipality not on the submitted vacant land inventory" and which " 'are devoted to a specific use [that] includes relatively low density development,' " could create an opportunity for affordable housing in the future if zoned for inclusionary development, and, accordingly should be included in the vacant land inventory. *N.J.A.C.* 5:93–4.2(d).

COAH also states that "[a] municipality may seek to eliminate sites or parts of sites from the vacant land inventory," including agricultural lands, active recreational land, conservation lands, historic and architecturally important sites, environmentally sensitive lands, park-lands and certain open spaces. *N.J.A.C.* 5:93–4.2(e). It indicates that those sites not "specifically eliminated from the vacant land inventory" will be considered "as sites suitable for inclusionary development." Pursuant to *N.J.A.C.* 5:93–4.2(f), COAH then "will consider the character of the area

surrounding each site and the need to provide housing for low and moderate income households in establishing density and set-asides for each site or part thereof remaining in the inventory." COAH explains that pursuant to *N.J.A.C.* 5:93–4.2(f), "[o]nce the density and set-aside of each site in the vacant land inventory is summed, the Council has determined the realistic development potential (RDP) of the municipality."

According to COAH's brief, "[a] municipality that received an adjustment due to lack of land in addressing its first-round obligation 'shall be presumed to have addressed its RDP, provided the municipality continues to implement the terms of its previous substantive certification.'" *N.J.A.C.* 5:93–4.2(f). COAH explains that pursuant to *N.J.A.C.* 5:93–4.2(g), "[a] municipality may address its RDP through any activity approved by the Council ... [and] need not incorporate into its housing element and fair share plan all sites used to calculate the RDP, if the municipality can devise an acceptable means of addressing its RDP." COAH adds that

> [t]he fact that *N.J.A.C.* 5:93–4.2(f) allows a presumption that a first-round RDP calculation will continue in the second round does not permit Cherry Hill to ignore the fact that the racetrack site is now available for development and should now be included in Cherry Hill's vacant land inventory. *The rule establishes a presumption, which can be rebutted by facts such as those that are presented here. . . . The Council's administration of vacant land adjustment [for] municipalities has always allowed for changes in the RDP calculation due to changed municipal circumstances.*

> [ (Emphasis added).]

After reviewing its vacant land adjustment rules, COAH concluded that the GSP property should be included in the Township's second-round plan and recalculation of the Township's RDP. However, it declined to speculate on whether or to what extent the GSP site was necessary to address the Township's RDP because "[t]he resolution of this issue requires Cherry Hill to calculate its second-round obligation and then create a plan to meet that obligation." It concluded that "[u]ntil this planning process occurs, the status of the [GSP] site and the appropriateness of any

development fee to be imposed on the development of the site cannot be determined."

### III

### A

■ The 1993 Agreement and Order addresses only the Township's round one obligation. After first seeking a reduction from COAH of its round one obligation, the Township entered into the 1993 Agreement and Order to reduce its round one obligation of 2295 units to 787 units. In fact, the very paragraph of the stipulation that the Township relies on to support its contention that the stipulation affects its round two obligation states that the "Township's fair share is reduced from 2295 to 787," an unmistakable reference only to round one. The March 1993 stipulation's statement that the 787 fair share unit allocation "shall represent the Township of Cherry Hill's *Mount Laurel* responsibility for 1987–1999" obviously was intended to give the Township the benefit of the traditional Mount Laurel six-year period of repose, see *Mount Laurel II, supra*, 92 *N.J.* at 291–92, 456 *A.*2d 390 (stating that compliance judgments "shall have *res judicata* effect ... for a period of six years"). It cannot possibly be construed as a determination that the Township has satisfied a round two obligation that COAH had not yet calculated.

The Township currently does not have substantive certification (or a judgment of repose) for round two or round three. By the very terms of the Township's development fee ordinance, the Township's authority to impose such fees apparently has expired. Moreover, when vacant land is placed on the market, COAH cannot determine whether that land will be needed for affordable housing until the Township has petitioned COAH for substantive certification and filed a housing element with COAH. The Legislature has delegated that responsibility to COAH after a municipality has agreed to participate in the process designed to achieve substantive certification. See *N.J.A.C.* 5:93–4.2 (addressing re-

duction of realistic development potential "due to available land capacity"). In the absence of substantive certification (or a judgment of repose), the Township is subject to challenge because of its failure to initiate compliance with its round two or round three obligation. In view of the representations made at oral argument by the Planning Board indicating that the Township is committed to meeting "whatever its obligation is" as determined by COAH or by the Court, we perceive that the Township is prepared to submit a housing element to COAH to begin the substantive certification process for round two, and subsequently for round three.

## B

■ The trial court determined, in effect, that development fees can serve as a substitute for on-site construction of affordable housing, relying principally on our statement in *Holmdel*, *supra*, 121 *N.J.* at 573, 583 *A.*2d 277, that "development fees are the functional equivalent of mandatory set-asides." The trial court's determination significantly misconstrues the *Holmdel* opinion. We stated in *Holmdel* that it was fair and reasonable, subject to COAH authorization, to require non-inclusionary developers to pay a development fee as a condition for development approval because "they possess, enjoy, and consume land, which constitutes the primary resources for housing." *Ibid.* We did not hold that by imposing development fees a municipality unilaterally could determine that land subject to such fees permanently could be eliminated by the municipality as a site to be used to satisfy its affordable housing obligation. The rationale underlying *Holmdel* cannot provide support for the trial court's determination that the proposed imposition of development fees on the owners of the GSP tract permanently precludes that tract from consideration as a site for affordable housing.

Our holding here does not suggest that every available site in a municipality seeking substantive certification must be used for affordable housing. However, as COAH asserts in its brief, a Township cannot be granted substantive certification until COAH

has determined that the Township is able to satisfy its allocated fair share obligation. The substantive certification process requires consideration of all appropriate sites in the municipality. The Legislature's delegation to COAH of the duty to determine a petitioning municipality's fair share obligation would be undermined irreparably if a municipality could, in effect, exempt choice parcels of land from its affordable housing obligation by the simple expedient of imposing a development fee.

## IV

We reverse the judgment of the Law Division and remand the matter to that court for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.